AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| KARL HAMPTON | ) | 3:21-MJ- 2825 |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  Jan. 18, 2019 and Feb. 21, 2019  in the county of  Williamson  in the
 Middle  District of  Tennessee , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | wire fraud |
| 18 U.S.C. 1957 | monetary transaction of more than $10,000 in criminally derived property |

This criminal complaint is based on these facts:
See Attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Susan McDavitt, Special Agent, FBI
Printed name and title

Sworn to me remotely by telephone, in compliance with
Fed. R. Crim. P. 4.1.

Date: May 6, 2021

_____
Judge's signature

City and state:  Nashville, Tennessee   Jeffery S. Frensley, United States Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

I, Susan E. McDavitt, Special Agent, Federal Bureau of Investigation ("FBI"), being duly sworn, hereby state as follows:

## Introduction and Agent Background

1. I have been a Special Agent with FBI for over twenty-three years. During that time, I have received training in complex financial crimes to include mail fraud, wire fraud, healthcare fraud, bankruptcy fraud, and money laundering. I have also received training and gained experience in interviewing and interrogation techniques, the execution of federal search and seizure warrants, and the identification and collection of evidence. I am currently assigned to the Memphis Division/Nashville Resident Agency Complex Financial Crimes Squad.

2. I make this statement, in part, on personal knowledge based on my direct participation in this investigation, and in part, upon information learned during the course of this investigation from other sources to include witness interviews, bank records, and financial statements. I am familiar with the facts and circumstances of this matter and the assertions made in this affidavit are based on first-hand knowledge or information received during the course of the investigation. Unless otherwise noted, the referenced information was provided by a person who may have direct or hearsay knowledge of the statement. Except where indicated, all statements referred to below are set forth in substance and in part, rather than verbatim.

3. This affidavit is submitted in support of a Criminal Complaint for the arrest of KARL HAMPTON and DEBORAH HAMPTON for the offense of Title 18 U.S.C. § 1343 (Wire Fraud) and § 1957 (Money Laundering).

## Investigation Background

4. KARL HAMPTON was a resident of Franklin, Tennessee. From approximately June 10, 2013 until May 31, 2019, KARL HAMPTON was employed as an exterminator technician for Belle Meade Exterminating Company, Inc. ("BMEC"). KARL HAMPTON earned approximately $28,000 per year from his employment at BMEC.

5. DEBORAH HAMPTON was a resident of Franklin, Tennessee and was KARL HAMPTON's wife. DEBORAH HAMPTON was unemployed.

6. B.W. was an elderly widow who did not have any children. In 2018, B.W. was 85 years of age. Beginning at some time before June 2019, B.W. suffered from dementia, which substantially impaired her cognitive and decision-making abilities.

7. While he was working as an exterminator at BMEC, KARL HAMPTON provided extermination services to B.W. at her home from approximately January 2016 through May 2019.

8. L.C. was B.W.'s sister. L.C. passed away in December 2017. In April 2018, B.W. was appointed as the executor for the Estate of L.C. Per the terms of L.C.'s will, L.C.'s estate was to be divided equally between B.W. and an individual whose initials were K.H.

9. L.B. was B.W.'s niece, and was a beneficiary of some of L.C.'s assets that did not flow through L.C.'s estate.

## The Wire Fraud Scheme

10. From approximately January 2018 continuing until in or about June 2020 KARL HAMPTON devised and intended to devise a scheme and artifice to defraud B.W., K.H., various financial institutions and credit and loan-issuing institutions, and others, and to obtain money and property by means of materially false pretenses, representations, and promises, and knowing

omissions of material fact, and by acts of concealment of the scheme, and in furtherance thereof, used interstate wires.

11. KARL HAMPTON devised and executed a scheme to defraud B.W. into believing that he was her son or godson and that he would care for her personally and financially. He used his influence over B.W. to convince her to sign over her Power of Attorney ("POA") and to name him in her Revocable Living Trust ("RLT") and in her Will. KARL HAMPTON methodically drained B.W.'s bank accounts, took out a $500,000 line of credit in her name using her securities as collateral, and amassed huge charges on her credit cards for his own personal expenses, all under the false pretenses that he had a valid POA, that he was entitled to B.W.'s money and property, and that he was acting for B.W.'s benefit and in her interest.

12. During 2018 through 2020, KARL HAMPTON took a total of approximately $1,240,438.06 from B.W.'s accounts. KARL HAMPTON maintained a bank account in the name of "Falcon Company," which KARL HAMPTON controlled, which received at least approximately $939,224 from B.W.'s bank accounts in the form of checks, cashier's checks, and bank transfers. KARL HAMPTON used B.W.'s funds to pay third parties for his benefit in the amount of at least approximately $193,000. KARL HAMPTON withdrew cash from B.W.'s bank accounts in the amounts of approximately $110,978. KARL HAMPTON used B.W.'s credit card for his own benefit in the amount of approximately $14,230.

13. Some of the funds KARL HAMPTON stole belonged to K.H. because they came from L.C.'s Estate. L.C. maintained an investment account at Vanguard, which, per the terms of her will, should have been divided equally between B.W. and K.H. On or about January 18, 2019, KARL HAMPTON contacted Vanguard to liquidate the account. Vanguard mailed B.W. a check in the amount of $139,474.64. The proceeds were deposited into the SunTrust account in the name

3

Case 3:21-mj-02825   Document 1   Filed 05/06/21   Page 4 of 9 PageID #: 4

"L.C. Estate." KARL HAMPTON transferred some of the proceeds from that account into B.W.'s SunTrust account and wrote checks to himself for the majority of the remainder of the proceeds.

14. L.C. also maintained an investment account at Charles Schwab, which, like the Vanguard account, should have been divided equally between B.W. and K.H. In February 2019, KARL HAMPTON caused the account to be liquidated. Charles Schwab mailed B.W. a check in the amount of $107,171.61, which was placed into the SunTrust account in the name of "L.C. Estate." KARL HAMPTON then transferred the majority of the proceeds to B.W.'s individual account at SunTrust and to himself.

15. L.C. also maintained an investment account at Lincoln Financial, of which B.W. was the beneficiary. In October 2018, KARL HAMPTON made an initial call to Lincoln Financial about the account and represented he was B.W.'s "personal assistant." Later, KARL HAMPTON provided Lincoln Financial with his personal email address as the contact for the account. In December 2019, KARL HAMPTON represented that he was calling about the account on behalf of his "mother," B.W. Lincoln Financial liquidated the account and mailed a check in the amount of $23,992.03 to B.W., which was deposited into her bank account at SunTrust. Within a few days of the deposit, KARL HAMPTON wrote checks to himself and purchased cashier's checks out of that account in the amount of $23,249.

16. B.W. maintained an investment account at Ameren. In February 2019, that account was liquidated, and Ameren mailed B.W. a check in the amount of $70,937.40. On February 25, 2019, that check was deposited into B.W.'s account at SunTrust. On February 26, 2019, KARL HAMPTON purchased a 2019 Kia Soul using funds from B.W.'s SunTrust account for the down payment. This vehicle is registered in the State of Tennessee to KARL HAMPTON.

4

17. On or about April 4, 2019, KARL HAMPTON accompanied B.W. to an attorney's office, where B.W. signed a Durable Power of Attorney (the "POA"), a Revocable Living Trust (the "RLT") and a will (the "Will"), each of which purported to give KARL HAMPTON considerable control over B.W.'s assets.

18. The POA appointed KARL HAMPTON as B.W.'s Agent and DEBORAH HAMPTON as the successor agent. The POA specified that KARL HAMPTON could care for B.W. and maintain her standard of living by, among other things, maintaining her residence, providing food, clothing, transportation, and medicine, arranging her care at a nursing facility or hospital, providing for companionship and comfort, and making her funeral arrangements. The POA granted KARL HAMPTON extensive powers, including the powers to transfer assets, purchase and sell property, to invest funds, to enter into contracts on B.W.'s behalf, to manage her real property, and to prepare her tax returns and pay her taxes. However, the POA specifically prohibited KARL HAMPTON from giving himself gifts out of B.W.'s funds without the prior permission of a specially-appointed Special Agent unrelated to KARL HAMPTON.

19. The RLT was a trust established to hold B.W.'s assets during her lifetime. B.W. was named as the Trustee of the RLT. The RLT named KARL HAMPTON, DEBORAH HAMPTON, and their minor daughter as beneficiaries of the RLT. The RLT specified that if B.W. became incapacitated, KARL HAMPTON, and then DEBORAH HAMPTON would become the Trustees. However, the RLT explained that B.W. was "incapacitated" only if a doctor or court determined she could not manage her affairs, or if she had an unexplained disappearance or absence of more than 30 days.

20. B.W.'s Will specified that, upon her death, B.W.'s assets would be distributed under the terms of the RLT.

21. The RLT specified that, upon B.W.'s death, the Trustee should distribute the first $300,000 to L.B. The remainder of the assets in the RLT would be placed into another trust created for the benefit of KARL HAMPTON. KARL HAMPTON was to be the Trustee of that trust. The RLT specified that, upon B.W.'s death, KARL HAMPTON could only receive funds if they were "necessary or advisable for his health, education, maintenance or support." In the RLT, B.W. specified:

> "[i]n making discretionary distributions to KARL HAMPTON, I desire that KARL HAMPTON develops a strong work ethic, is a productive and contributing member of society, and provides for those who are dependent on him for care and support. Accordingly, my Trustee shall always consider the other known resources available to KARL HAMPTON before making discretionary distributions. I desire that preservation of principal be a priority for purposes of this trust, and that KARL HAMPTON show genuine need before my Trustee makes any discretionary distribution."

22. In May 2019, shortly after inducing B.W. to sign the POA, KARL HAMPTON quit his job at BMEC and thereafter continued to drain B.W.'s bank accounts to purchase lottery tickets and to fund his lavish lifestyle.

23. On June 8, 2019, B.W. fell and fractured her hip. She was transported to Williamson County Medical Center ("WCMC") and then to NHC of Cool Springs ("NHC"), which was an assisted living facility, for recovery following hip surgery. During her hospital visit and transfer to NHC, B.W. was diagnosed with dementia. Staff at NHC also noted that B.W. was malnourished when she arrived. On June 14, 2019, NHC staff discussed with KARL HAMPTON that B.W. suffered from dementia.

24. Upon B.W.'s admission to WCMC and on the application to place her at NHC, KARL HAMPTON listed himself as B.W.'s "son," her trustee, POA, and emergency contact. KARL HAMPTON is not B.W.'s son.

25. While KARL HAMPTON was draining B.W.'s bank accounts for his own personal use, he also ran up significant charges on B.W.'s credit cards, but only infrequently even made the minimum payments. KARL HAMPTON used B.W.'s credit card to pay for her care at NHC, but rather than pay off the credit card, he let the charges accumulate. Meanwhile, he took large cash advances against the card.

26. KARL HAMPTON also frequently purchased luxury items and lottery tickets using large amounts of cash, often spending between $1,000 and $1,500 per day on lottery tickets.

27. In December 2019, KARL HAMPTON took out a $500,000 line of credit (the "LOC") in B.W.'s name at SunTrust, using B.W.'s security accounts at SunTrust as collateral. The LOC was deposited into B.W.'s account at SunTrust. KARL HAMPTON then wrote checks to himself, purchased cashier's checks, took out cash withdrawals, and transferred money out of B.W.'s bank account at SunTrust to a bank account in the name of Falcon Company.

28. In January 2020, KARL HAMPTON used $170,000 of the money from the LOC to purchase an ownership interest in his own name in a pest control business known to the Grand Jury located in Franklin, Tennessee, which has initials "F.P.C."

29. Also in January 2020, KARL HAMPTON rented an apartment in Murfreesboro, Tennessee, in B.W.'s name. By this time, B.W. had been living at NHC for almost six months.

30. On or about January 18, 2019, in the Middle District of Tennessee, and elsewhere, KARL HAMPTON, for the purpose of executing and attempting to execute the scheme to defraud, caused to be transmitted by means of wire communications in interstate commerce the following signals and sounds: a telephone call by KARL HAMPTON, B.W., and a representative of SunTrust, in Brentwood, TN, to Vanguard, in PA, requesting the liquidation of the account in the name of the Estate of L.C.

## Money Laundering

31. KARL HAMPTON and DEBORAH HAMPTON knew that KARL HAMPTON had obtained funds from B.W. through the wire fraud scheme described above.

32. DEBORAH HAMPTON well knew that KARL HAMPTON made only approximately $28,000 per year as an exterminator for the years 2018 through 2019, and that DEBORAH HAMPTON was unemployed. Further, DEBORAH HAMPTON well knew that in May 2019 KARL HAMPTON was no longer employed by BMEC.

33. On or about February 21, 2019, in the Middle District of Tennessee, KARL HAMPTON and DEBORAH HAMPTON did knowingly engage in monetary transactions affecting interstate commerce, in criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957, which represented criminal proceeds from wire fraud, in violation of 18 U.S.C. § 1343, to wit, a down payment of $21,000 with SunTrust Official Check number 5300569106 on a 2018 Lexus GX460 in DEBORAH HAMPTON's name. B.W. was listed as the purchaser of the cashier's check, and the memo line noted "KCH Trustee."

34. In addition to the above, the investigation revealed that in January 2020, KARL HAMPTON and DEBORAH HAMPTON purchased a 4.3-karat diamond ring, which cost $21,452, with proceeds of the fraud.

35. Based on all the foregoing I submit that there is probable cause to arrest KARL HAMPTON for violations of Title 18, U.S.C. § 1343 (Wire Fraud); and § 1957 (Money Laundering) and DEBORAH HAMPTON for a violation of 18 U.S.C. § 1957 (Money Laundering).